# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TALIA JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16cv1052 |
| | ) | |
| DAVID V. BYRD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the Court for a sua sponte determination of frivolousness.  For the reasons that follow, the Court should dismiss this action without prejudice to Plaintiff's right to pursue her claims in a proper forum.

## INTRODUCTION

On August 12, 2016, Plaintiff initiated the instant action by filing an Application for Leave to Proceed in Forma Pauperis (Docket Entry 1) (the "IFP Application"), "Complaint" (Docket Entry 3) (the "Complaint"), "Plaintiff's Motion for a Preliminary Injunction" (Docket Entry 4) (the "PI Motion"), "Memorandum in Support of [the PI Motion]" (Docket Entry 5), "[Plaintiff]'s Supporting Declaration" (Docket Entry 6), and numerous exhibits (Docket Entry 6-1 at 1-60).  The Complaint challenges approximately 20 orders entered by the District Court of Yadkin County (the "State Court") in an ongoing child custody case involving Plaintiff

and her ex-husband, Daniel Brock Johnson ("Brock Johnson"). (Docket Entry 3 at 2 ("This action stems from file number 14-CVD-568, Daniel Brock Johnson . . . v. Talia Dratsch Johnson, pending before the [State Court]"), 14 (discussing divorce of Plaintiff and Brock Johnson), and 44 (requesting injunction against enforcement of 20 orders entered by the State Court); see also Docket Entry 6-1 (providing copies of several of the State Court's orders).) The Complaint names defendants David V. Byrd, Chief District Court Judge for the 23rd Judicial District ("Defendant Byrd"), Jeanie R. Houston, District Court Judge for the 23rd Judicial District ("Defendant Houston"), William F. Brooks, District Court Judge for the 23rd Judicial District ("Defendant Brooks"), Angela B. Puckett, District Court Judge for the 17B Judicial District ("Defendant Puckett," and collectively with Defendants Byrd, Houston, and Brooks, the "Judge Defendants"), and Renee M. Hauser, DC Trial Court Coordinator for Wilkes County - District 23, North Carolina ("Defendant Hauser," and collectively with the Judge Defendants, the "Defendants"). (Docket Entry 3 at 1, 7-8.) Plaintiff sues Defendants in both their individual and official capacities for their alleged involvement in her pending child custody case in the State Court. (Id. at 1-2.)

According to the Complaint, "Defendants conspired to commit fraud upon the court to deprive constitutional rights under color of state law to retaliate against the Plaintiff for speaking

-2-

against in [sic] court about federal and constitutional violations by the Defendants in favor of [Brock Johnson]." (Id. at 2.) Specifically, the Complaint alleges that Brock Johnson's family "are well known and have influence throughout Yadkin . . . and other surrounding counties" (id. at 17), resulting in an overall bias against Plaintiff throughout her child custody case (see, e.g., id. ("Plaintiff was desperate to be heard [in the State Court], but just could not make that happen . . . . On the other hand, [Brock Johnson] effortlessly moved through court proceedings . . . .")). The Complaint also asserts that, as a result of Brock Johnson's influence, Defendants "engag[ed] in ex parte determinations that effectively terminate[d] Plaintiff's parental rights [in favor of Brock Johnson] based on bogus allegations," and violated and continue to violate Plaintiff's state and federal constitutional rights. (Id. at 39.) Further, the Complaint states that Defendants entered numerous "ex-parte" orders against Plaintiff without "proceeding transcripts," "findings," or "reliance on specific law," thereby "mak[ing] adequate and meaningful state appellate review remedies unavailable to the Plaintiff." (Id. at 5 (bold and all-caps font omitted).)

Although it generally describes collective mistreatment by Defendants, the Complaint also presents specific allegations against Defendant Houston. (See id. at 19-24.) In particular, the Complaint asserts that Defendant Houston declared a mistrial and

recused herself from Plaintiff's child custody case based on Defendant Houston's false accusation that "Plaintiff went to [Defendant Houston's] church on purpose." (Id. at 19; see also id. at 20 (stating that "Plaintiff was informed that a [j]udge from another district was to be brought in to handle the case")).) The Complaint alleges that the mistrial and recusal effectively "sabotaged everything Plaintiff worked for, putting [her child custody] case back at square one." (Id. at 19.) The Complaint further alleges that, after Defendant Houston declared a mistrial, Brock Johnson moved for attorney's fees (id.), and that Defendant Houston conducted ex parte communications with Brock Johnson's attorney regarding her reasons for the recusal and declaring a mistrial (id. at 19-20, 24). According to the Complaint, Defendant Houston testified at the hearing on the attorney's fees motion and "changed her story" about her interactions with Plaintiff. (Id. at 23.) Plaintiff contends that these actions amount to judicial misconduct. (Id. at 13, 24, 46.)

In pursuing relief, the Complaint asserts violations of North Carolina law and its constitution (see, e.g., id. at 8-9, 13-14, 39-40), as well as violations under 42 U.S.C. §§ 1983, 1985, and 1986, arising from Defendants' alleged interference with Plaintiff's federal constitutional rights (see, e.g., id. at 10-11). The Complaint requests a declaratory judgment pursuant to 28 U.S.C. § 2201 (id. at 1) that "Plaintiff's parental right is

-4-

constitutionally protected," "Defendants' state deprivation of parental right and freedom of movement requires due process of law and the application of strict scrutiny," and Defendants' alleged practices of (1) engaging in ex parte communications, (2) failing to provide adequate notice and stenographic recordings of child custody proceedings, and (3) entering judgments against Plaintiff without jurisdiction or findings of fact, qualify as unconstitutional (id. at 44-48). Finally, the Complaint seeks an injunction prohibiting Defendants from enforcing the 20 challenged orders and from engaging in unrecorded, ex parte custodial proceedings that deprive Plaintiff of due process and prevent meaningful appellate review. (Id. at 44-45.)

## ANALYSIS

After filing the IFP Application (Docket Entry 1), Plaintiff paid the filing fee (see Docket Entry dated Aug. 25, 2016). To the extent that conduct effectively withdrew the IFP Application, the Court may no longer dismiss the Complaint under 28 U.S.C. § 1915. See Yi v. Social Sec. Admin., 554 F. App'x 247, 248 (4th Cir. 2014) (explaining that, "[b]ecause [the plaintiff] is neither a prisoner nor proceeding in forma pauperis in district court, the provisions of 28 U.S.C. §§ 1915(e)(2), 1915A (2006), permitting sua sponte dismissal of complaints which fail to state a claim are inapplicable"). Regardless, the Court possesses inherent authority to dismiss a frivolous action, even when "the filing fee has been

-5-

paid." Id. (citing Mallard v. United States Dist. Ct. for the S. Dist. of Iowa, 490 U.S. 296, 307–08 (1989) (explaining that the informa pauperis statute "authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have the power to do so even in the absence of this statutory provision")); see also Nagy v. Federal Med. Ctr. Butner, 376 F.3d 252, 256–57 (4th Cir. 2004) ("The word frivolous is inherently elastic and not susceptible to categorical definition. . . . The term's capaciousness directs lower courts to conduct a flexible analysis, in light of the totality of the circumstances, of all factors bearing upon the frivolity of a claim." (internal quotation marks omitted)). Moreover, "because a [federal] court lacks subject matter jurisdiction over an obviously frivolous complaint, dismissal prior to service of process is permitted." Yi, 554 F. App'x at 248 (citing Ricketts v. Midwest Nat'l Bank, 874 F.2d 1177, 1181–83 (7th Cir. 1989)); see also Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005) ("A federal court has an independent obligation to assess its subject-matter jurisdiction, and it will raise a lack of subject-matter jurisdiction on its own motion." (internal quotation marks omitted)).[1]

---

[1] The Court (per the undersigned United States Magistrate Judge) entered an order "staying any further action in this case, including service of process, pending review by the Court of subject-matter jurisdiction." (Text Order dated Aug. 25, 2016.)

-6-

In this case, the Complaint's federal claims qualify as frivolous in light of various immunity-related doctrines, jurisdictional bars, and abstention principles. Additionally, the Court lacks original jurisdiction over Plaintiff's state claims (as diversity jurisdiction does not exist), and the Court should decline to exercise supplemental jurisdiction over those claims.

## I. Immunity and Related Doctrines

As an initial matter, each Defendant enjoys immunity in this Court from liability for the allegations in the Complaint. All four of the Judge Defendants serve as North Carolina district court judges. (Docket Entry 3 at 7-8.) "Judges performing *judicial acts* within their jurisdiction are entitled to absolute immunity from civil liability claims," In re Mills, 287 F. App'x. 273, 279 (4th Cir. 2008) (emphasis added), "even if such acts were allegedly done either maliciously or corruptly," King v. Myers, 973 F.2d 354, 356 (4th Cir. 1992) (citing Pierson v. Ray, 386 U.S. 547, 554 (1967)). See also Mireles v. Waco, 502 U.S. 9, 11 (1991) (stating that "judicial immunity is an immunity from suit, not just from ultimate assessment of damages"). To determine whether an action constitutes a "judicial act" protected by judicial immunity, the Court must consider "whether the function is one normally performed by a judge, and whether the parties dealt with the judge in his or her judicial capacity." King, 973 F.2d at 357. Thus, a plaintiff

-7-

can overcome the judicial immunity bar to recovery only if the judge's "actions were non-judicial or the actions were judicial but were taken without jurisdiction." Evans v. Downey, No. 1:15-CV-117, 2016 WL 3562102, at *2 (W.D. Ky. June 24, 2016) (citing Mireles, 502 U.S. at 13).

The Complaint's allegations against the Judge Defendants concern their judicial actions in child custody matters before the District Court Division of the North Carolina General Court of Justice. (See Docket Entry 3 at 2; see also Docket Entry 6-1 (providing relevant State Court orders).) The North Carolina District Court Division maintains "original, exclusive, and continuing jurisdiction over child custody . . . actions instituted pursuant to Chapters 50A and 52C of the North Carolina General Statutes." Warren v. Bray, No. 1:13CV1144, 2014 WL 3404962, at *5 (M.D.N.C. July 10, 2014) (citing N.C. Gen. Stat. § 7A-244; N.C. Gen. Stat. § 52C-1-102), recommendation adopted, slip op. (M.D.N.C. Aug. 5, 2014). Thus, in presiding over hearings and entering the orders at issue, the Judge Defendants "properly exercised jurisdiction over matters vested by law in the district court division." Id. (concluding that absolute judicial immunity barred the plaintiff's claims against a North Carolina state district court judge presiding over a child custody and support dispute); see also Stump v. Sparkman, 435 U.S. 349, 357 (1978) (recognizing judges' entitlement to absolute immunity unless acting in "clear

-8-

absence of all jurisdiction" (internal quotation marks omitted)). Further, as each of Plaintiff's allegations concern the Judge Defendants' judicial acts, even if their judicial orders involved ex parte communications and/or denied Plaintiff due process, judicial immunity would still apply. See Mikhail v. Kahn, 991 F. Supp. 2d 596, 660 (E.D. Pa. 2014) (holding that the "[j]udges are absolutely immune from suit under section 1983 for monetary damages arising from their judicial acts," even if such acts took "place *ex parte* and without notice or a hearing" (internal quotation marks omitted)). Accordingly, the Judge Defendants enjoy absolute judicial immunity in this action. See Harry v. Lauderdale Cty., 212 F. App'x 344, 346-47 (5th Cir. 2007) (affirming dismissal of the plaintiff's claims against state court judge brought under state law and 42 U.S.C. §§ 1983, 1985, 1986, and 1988 because judicial immunity barred liability).

Plaintiff also takes issue with Defendant Houston's testimony as a witness in one of the hearings. Specifically, Plaintiff alleges that Defendant Houston "changed her story" when testifying at the hearing on Brock Johnson's motion for attorney's fees. (Docket Entry 3 at 23.) However, the common-law immunity for witnesses bars Plaintiff's claims for damages based on that alleged testimony. See Briscoe v. LaHue, 460 U.S. 325, 328 (1983) (noting that "all witnesses . . . are absolutely immune from civil liability based on their testimony in judicial proceedings"); see

-9-

also <u>Moldowan v. City of Warren</u>, 578 F.3d 351, 390 (6th Cir. 2009) (explaining that "[a] witness is entitled to testimonial immunity no matter how egregious or perjurious that testimony was alleged to have been" (internal quotation marks omitted)). Moreover, Defendant Houston's testimony involved the reasons she recused herself and ordered a mistrial in Plaintiff's child custody case (<u>see</u> Docket Entry 3 at 20-24), matters intricately related to her judicial actions (<u>see</u> <u>id.</u> at 19). Under these circumstances, even if the Complaint's assertion that Defendant Houston changed her story about the reasons for recusal or declaring a mistrial could qualify as malicious or corrupt, judicial immunity would still apply. <u>See generally</u> <u>King</u>, 973 F.2d at 356.

Next, to the extent the Complaint attempts to hold Defendant Hauser liable as a trial court coordinator (<u>see</u> Docket Entry 3 at 8), quasi-judicial immunity bars those claims. <u>See</u> <u>In re Mills</u>, 287 F. App'x at 279 (ruling that quasi-judicial immunity extends to "judge's subordinates for 'functions that are more administrative in character [that] have been undertaken pursuant to the [judge's] explicit direction'" (quoting <u>Kincaid v. Vail</u>, 969 F.2d 594, 601 (7th Cir. 1992))); <u>see also</u> <u>Shelton v. Wallace</u>, 886 F. Supp. 1365, 1371 (S.D. Ohio 1995) (noting that "[*q*]*uasi*-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are

-10-

considered to be figurative arms of the very commanding judge who is immune").[2]

The Complaint also seeks relief from Defendants in their official capacities. As noted, the Complaint alleges that, at all relevant times, Defendants served as officers with the District Court Division of the North Carolina General Court of Justice. (Docket Entry 3 at 7-8.) As such, Defendants constitute state officials for purposes of this litigation. See Warren, 2014 WL 3404962, at *5 (recognizing that North Carolina district court judges qualify as state officials in parallel context).

"[A] suit for damages against a state official in his official capacity is actually a suit against his office and, thus, the State." Eller v. Kaufman, No. 2:11CV31, 2012 WL 3018295, at *8 (W.D.N.C. July 24, 2012) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)). "[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." Kentucky v. Graham, 473 U.S. 159, 169 (1985) (internal footnote and citation omitted).

Sections 1983, 1985, and 1986 provide for suits against a "person," not a state. See 42 U.S.C. §§ 1983, 1985, & 1986. Thus,

---

[2] The Complaint offers no specific allegations against Defendant Hauser. (See Docket Entry 3.)

"Congress did not exercise its power to abrogate a state's Eleventh Amendment immunity when it enacted 42 U.S.C. §[§] 1983[, 1985, and 1986]." Coffin v. South Carolina Dep't of Soc. Servs., 562 F. Supp. 579, 585 (D.S.C. 1983) (ruling that, "just as neither [the state agency defendant] nor the Board as *alter egos* of the state is a 'person' within the meaning of 42 U.S.C. § 1983, neither one is a 'person' within the meaning of 42 U.S.C. §§ 1985 and 1986").

Likewise, because a suit against Defendants in their official capacities constitutes a suit against the State, and the term "person" under Sections 1983, 1985, and 1986 does not encompass the State, Plaintiff's official capacity claims fail in such obvious fashion as to qualify as frivolous. See Woodward v. Chautauqua Cty., No. 15-CV-246, 2016 WL 4491712, at *2 (W.D.N.Y. July 5, 2016) (concluding that "[n]either a state agency nor a state officer acting in his official capacity is subject to suit under 42 U.S.C. § 1983, § 1985, and § 1986" (citing Posr v. Court Officer Shield No. 207, 180 F.3d 409 (2d Cir. 1999))), recommendation adopted, 2016 WL 4475044, at *1 (W.D.N.Y. Aug. 25, 2016); Warren, 2014 WL 3404962, at *5 (holding that Eleventh Amendment immunity bars Section 1985 claim against North Carolina district court judge sued in her official capacity).[3]

_____

[3] Plaintiff's Section 1985 and 1986 claims also cannot establish federal jurisdiction because the Complaint contains no factual allegations to support those claims. In that regard, all three subsections of Section 1985 require proof of a particular

As a final matter, the Complaint's requests for injunctive and declaratory relief also cannot proceed. Specifically, the Complaint asks the Court to enjoin Defendants from enforcing the 20 orders entered in Plaintiff's child custody case and from engaging in unrecorded, ex parte proceedings. (See Docket Entry 3 at 44-48.) By statute, "injunctive relief shall not be granted" in an "action brought against a judicial officer for an act or omission

_____

species of conspiracy. See 42 U.S.C. § 1985 (1), (2), & (3). First, Section 1985(1) relates to a plaintiff's office or official duties. See 42 U.S.C. § 1985(1); Stankowski v. Farley, 251 F. App'x 743, 747 n.1 (3d Cir. 2007) ("Section 1985(1) prohibits conspiracies to prevent individuals from holding office or discharging official duties."). The Complaint alleges no such matters. (See Docket Entry 3.) Next, as concerns state court proceedings, Section 1985(2) addresses acts involving either "force, intimidation, or threat" against witnesses or jurors to obstruct justice because of race or other group-related bias. See 42 U.S.C. § 1985(2); Kush v. Rutledge, 460 U.S. 719, 725-26 (1983) (explaining that portion of Section 1985(2) that addresses obstruction of state court proceedings "contains language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws," further understood as "racial, or perhaps otherwise class-based, invidiously discriminatory animus" (internal quotation marks omitted)); Stankowski, 251 F. App'x at 747 n.1 ("Section 1985(2) prohibits conspiracies to prevent witnesses from testifying in court, injuring witnesses who have testified, or attempting to influence or injure grand or petit jurors."). The Complaint, however, does not make allegations of that sort. (See Docket Entry 3.) Finally, Section 1985(3) requires proof of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). No such allegations appear in the Complaint. (See Docket Entry 3.) Moreover, because "[r]ecovery under § 1986 depends on the existence of a conspiracy under § 1985," Bowie v. Maddox, 642 F.3d 1122, 1128 (D.C. Cir. 2011), Plaintiff's purported claim under Section 1986 also provides no basis for federal jurisdiction.

-13-

taken in such officer's judicial capacity . . . unless a
declaratory decree was violated or declaratory relief was
unavailable." 42 U.S.C. § 1983. "Thus, the doctrine of judicial
immunity in Section 1983 actions now extends to suits for
injunctive relief." Clay v. Osteen, 1:10CV399, 2010 WL 4116882, at
*4 (M.D.N.C. Oct. 19, 2010) (citing Roth v. King, 449 F.3d 1272,
1286 (D.C. Cir. 2006)), recommendation adopted, slip op. (M.D.N.C.
Nov. 17, 2010); see also Lepelletier v. Tran, 633 F. App'x 126, 127
(4th Cir. 2016) (concluding that the appellant's "claims seeking
injunctive relief against a sitting state court judge for actions
taken in his judicial capacity . . . were barred by the plain
language of 42 U.S.C. § 1983"). As discussed above, the Judge
Defendants acted in their judicial capacities and within their
jurisdiction, and Defendant Hauser acted in her quasi-judicial
capacity, with regard to each of the alleged violations of
Plaintiff's constitutional rights. Accordingly, the judicial
immunity bar extends to Plaintiff's requests for injunctive relief.

Regarding relief under 28 U.S.C. § 2201, Plaintiff effectively
seeks a declaration that would strip Defendants of judicial
immunity and impose liability. (See Docket Entry 3 at 44-47
(requesting a declaratory judgment that Defendants' practice of
adjudicating child custody matters violates Plaintiff's
constitutional rights and warrants entry of an injunction to stop
such violations).) However, "[d]eclaratory judgments are not meant

-14-

simply to proclaim that one party is liable to another." Johnson v. McCuskey, 72 F. App'x 475, 478 (7th Cir. 2003) (citing Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1553–54 (Fed. Cir. 1994) (en banc)). Rather, declaratory judgments "define the legal rights and obligations of the parties in anticipation of some future conduct." Id. at 477 (holding declaratory relief improper where the plaintiff sought declaration that the judicial defendants acted improperly when deciding change of venue motion). Because Plaintiff's requests for declaratory relief merely attempt to have the Court proclaim Defendants' liability in this action, those requests fail. See Clay, 2010 WL 4116882, at *4 (denying request that the court declare dismissal of action exceeded judge's authority because the "[p]laintiffs are not seeking declaratory relief in the true legal sense," but instead attempting to impose liability on an immune defendant).

In sum, various immunity and related doctrines bar Plaintiff's claims for damages and injunctive relief, and Plaintiff has not requested proper declaratory relief.

## II. Rooker-Feldman Doctrine

The Rooker-Feldman doctrine also deprives the Court of jurisdiction over Plaintiff's claims. Derived from the Supreme Court's decisions in District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), and Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), the Rooker-Feldman doctrine generally prohibits

-15-

lower federal courts from reviewing state-court decisions. See Plyler v. Moore, 129 F.3d 728, 731 (4th Cir. 1997). "[R]ather, jurisdiction to review such decisions lies exclusively with superior state courts and, ultimately, the United States Supreme Court." Id.; see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005) (clarifying that the Rooker–Feldman doctrine bars a federal court from asserting jurisdiction in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the [federal] court proceedings commenced and inviting [federal] court review and rejection of those judgments"). The doctrine also "applies to interlocutory orders issued by state courts." Brown & Root, Inc. v. Breckenridge, 211 F.3d 194, 199 (4th Cir. 2000) ("Indeed, it cannot be the meaning of *Rooker-Feldman* that, while the inferior federal courts are barred from reviewing *final* decisions of state courts, they are free to review interlocutory orders." (emphasis in original) (internal brackets and quotation marks omitted)).

The Rooker–Feldman bar extends not only to issues actually presented to and decided by a state court, but also to issues that are "inextricably intertwined" with questions adjudicated by a state court. Plyler, 129 F.3d at 731 (internal quotation marks omitted). A federal claim is "inextricably intertwined" with a state-court decision where, "in order to grant the federal plaintiff the relief sought, the federal court must determine that

-16-

the [state] court judgment was erroneously entered or must take
action that would render the judgment ineffectual." Jordahl v.
Democratic Party of Va., 122 F.3d 192, 202 (4th Cir. 1997)
(internal quotation marks omitted). Rooker-Feldman therefore
applies when the federal action "essentially amounts to nothing
more than an attempt to seek review of [the state court's] decision
by a lower federal court." Plyler, 129 F.3d at 733.

Despite the above-quoted language in Plyler and Brown & Root
barring federal court review of all levels of state-court
judgments, the United States Court of Appeals for the Fourth
Circuit recently suggested that the Rooker-Feldman doctrine may
only apply when a federal court is "called upon to exercise
appellate jurisdiction over a final judgment from 'the highest
court of a State in which a decision could be had,' 28 U.S.C. §
1257(a) . . ., as was the case in both Rooker and Feldman." Thana
v. Board of License Comm'rs for Charles Cty., Md., 827 F.3d 314,
321 (4th Cir. 2016) (emphasis in original). The Fourth Circuit,
however, also indicated that the Rooker-Feldman doctrine did not
preclude federal jurisdiction in that case because (1) the
plaintiff's federal court action challenged a state administrative
agency's decision "rather than alleging injury caused by a state
court judgment," (2) "the Rooker-Feldman doctrine does not apply as
a categorical matter" to challenges to state administrative
actions, (3) the numerous differences in the plaintiff's state

-17-

court action as compared with the federal action (e.g., "[t]he state proceeding . . . [involved] an agency-initiated proceeding, in which limited and deferential judicial review was afforded," and the state court lacked authority to award damages, whereas the federal court could provide such relief) "demonstrate that th[e] federal action must be seen as an independent, concurrent action that does not undermine the Supreme Court's jurisdiction over any state court judgment," and (4) the plaintiff "never sought to bypass the Supreme Court's appellate jurisdiction under 28 U.S.C. § 1257(a) over any relevant state court judgment," as it continued to appeal the state court judgment through the state's appellate courts, "thereby remaining on track for potential review by the U.S. Supreme Court." Id. at 321-22 (emphasis in original).

The Fourth Circuit, in Thana, ultimately concluded, "[a]t bottom, . . . that th[e] federal action, commenced by [the plaintiff] under 42 U.S.C. § 1983 and alleging injury inflicted by actions of a state administrative agency, qualifie[d] as an independent, concurrent action that [did] not undermine the Supreme Court's appellate jurisdiction over state court judgments, and accordingly the Rooker-Feldman doctrine [did] not apply." Id. at 322-23. In light of that disposition, the Thana Court's suggestion that the Rooker-Feldman doctrine does not bar federal challenges to state court judgments that have yet to reach the highest level of state appellate review appears to represent non-binding dicta.

-18-

See Board of Comm'rs of Hertford Cty., N.C. v. Tome, 153 F. 81, 87 (4th Cir. 1907) ("[E]xpressions found in opinions of courts which relate to a doctrine of law not necessarily in issue in the case then before the court are not to be regarded as deliberate and binding enunciations of such doctrines. Carroll v. Carroll's Lessee, 16 How. 275, 287, 14 L. Ed. 936 [(1853)]. It is probable that there is no volume of the Supreme Court Reports in which the idea is not advanced that expressions of opinion not necessary to the determination of the case are to be regarded as dicta.").[4]

As a result, pursuant to prior Fourth Circuit precedent (such as Plyler and Brown & Root), the Rooker-Feldman doctrine still bars federal review of all levels of state court judgments, including Plaintiff's claims in this case. In that regard, the Complaint asks this Court to enjoin Defendants from enforcing approximately 20 orders in her ongoing child custody dispute. (Docket Entry 3 at

_____

[4] Shortly before the Fourth Circuit decided Thana, a neighboring district court applied the Rooker-Feldman doctrine (in a case strikingly similar to the one at bar) to deny review of certain state court judgments involving child custody matters and constitutional challenges to those judgments. Steg v. Johnson, No. 5:16-CV-149, Docket Entry 6 (E.D.N.C. May 31, 2016). On appeal, the Fourth Circuit noted that the district court issued its order before Thana clarified the "narrow scope of the [Rooker-Feldman] doctrine." Steg v. Johnson, No. 16-1654, ___ F. App'x ___, n.1, 2016 WL 5682664, at *1 n.1 (4th Cir. Oct. 3, 2016). Nevertheless, "because the district court provided alternate and sufficient bases for rejecting all of the [plaintiffs'] claims, [the Fourth Circuit found] it unnecessary to consider whether the [district] court's Rooker-Feldman analysis [was] in line with Thana." Id.

44.)  Such requests would necessarily require this Court to scrutinize the orders entered by the State Court, a course of action which district courts in this Circuit have deemed the Rooker-Feldman doctrine to prohibit.  See, e.g., Powell v. Williams, No. 5:14-CV-282, 2014 WL 3809964, at *3 (E.D.N.C. July 14, 2014) (holding that, "to the extent such [child custody or child support] matters have been determined by the state court, this court is . . . barred by the *Rooker–Feldman* doctrine from reviewing the state court's decisions").

In addition, Plaintiff's federal claims qualify as "inextricably intertwined" with the State Court's orders in the underlying child custody proceedings.  For instance, the Complaint seeks an injunction requiring Defendants to alter the alleged unconstitutional methods in which they conduct custody proceedings (i.e. prohibiting ex parte communications and mandating stenographic recordings of all proceedings).  (Docket Entry 3 at 45-46.)  Such relief would effectively determine that the Judge Defendants' methods of conducting past child custody proceedings violated federal law and/or the United States Constitution.  That determination, in turn, would necessarily establish that the Judge Defendants improperly entered the 20 orders that Plaintiff asks this Court to void.

Accordingly, the Rooker-Feldman doctrine (at least as understood prior to Thana) precludes this Court from exercising

jurisdiction in this case. See Stratton v. Mecklenburg Cty. Dep't of Soc. Servs., 521 F. App'x 278, 291 (4th Cir. 2013) (holding that, because the plaintiff's "due process claim is a mere pretext for the real focus of the [c]omplaint, which challenges the validity of records and proceedings of the North Carolina courts that resulted in the termination of the [plaintiff's] parental rights," the Rooker-Feldman doctrine bars consideration of that claim); see also Amerson v. Iowa, 94 F.3d 510, 513 (8th Cir. 1996) (noting that "a plaintiff's incidental insertion of a general claim for damages will not suffice to prevent the dismissal of a § 1983 case where the damages sought cannot be awarded without first declaring unconstitutional a state court judgment on a matter firmly committed to the states"); Ritter v. Ross, 992 F.2d 750, 754 (7th Cir. 1993) (concluding that a dissatisfied state litigant "'may not seek a reversal of a state court judgment simply by casting his complaint in the form of a civil rights action'" (quoting Hagerty v. Succession of Clement, 749 F.2d 217, 220 (5th Cir. 1984), cert. denied, 474 U.S. 968 (1985))); Guess v. Board of Med. Exam'rs of State of N.C., 967 F.2d 998, 1005 (4th Cir. 1992) ("Artificial attempts to redefine the relief sought are not sufficient to overcome the requirements of Feldman.").

### III. Younger Abstention

Abstention principles articulated in Younger v. Harris, 401 U.S. 37 (1971), further compel dismissal of the Complaint's

-21-

requests for declaratory and injunctive relief.[5] "*Younger* abstention requires a federal court to abstain from granting injunctive or declaratory relief that would interfere with pending state judicial proceedings." O'Neill v. Coughlan, 511 F.3d 638, 643 (6th Cir. 2008) (citing Younger, 401 U.S. at 40-41); see also Samuels v. Mackell, 401 U.S. 66, 73 (1971) (holding that, "where an injunction would be impermissible under [Younger abstention] principles, declaratory relief should ordinarily be denied as well"). Three "exceptional circumstances" can trigger Younger abstention. Sprint Commc'ns, Inc. v. Jacobs, ___ U.S. ___, ___, 134 S. Ct. 584, 591 (2013) (internal quotation marks omitted).

Specifically, Younger abstention precludes federal intrusion into ongoing state (1) criminal prosecutions, (2) "civil proceedings that are akin to criminal prosecutions," and (3) civil proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts." Id. at ___, 134 S. Ct. at 588. If an action falls into one of those three categories, a federal court evaluating whether to proceed may consider "additional factors" described in Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423 (1982). See Sprint, ___ U.S.

---

[5] "[T]he Court's discretion to decline to exercise jurisdiction by dismissing under *Younger* does not extend to . . . causes of action for damages, which may be stayed but not dismissed on abstention grounds." Tucker v. Specialized Loan Servicing, LLC, 83 F. Supp. 3d 635, 647 (D. Md. 2015) (citing Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 721 (1996)).

at \_\_\_, 134 S.Ct. at 593 (emphasis omitted).  Those additional factors include whether the ongoing state proceedings "implicate important state interests" and provide "an adequate opportunity . . . to raise [federal] challenges."  Middlesex, 457 U.S. at 432.

Here, the relevant circumstances call for abstention under Younger.  First, Plaintiff's allegations indicate that proceedings in the State Court child custody case began before the initiation of this action and remain ongoing.  (See Docket Entry 6-1 at 13 (providing copy of order entered in the State Court child custody case dated October 6, 2014); see also Docket Entry 3 at 2 (reflecting the "pending" nature of the State Court custody case when Plaintiff filed the Complaint on August 12, 2016).)[6]  Second, the Complaint requests declaratory and injunctive relief that would impact enforcement of 20 State Court orders entered by the Judge Defendants determining, inter alia, Plaintiff's rights to custody of her child.  (See Docket Entry 3 at 6.)

---

[6] According to Plaintiff's filings, the State Court entered an "Ex Parte Emergency Custody Order" earlier this year that awarded temporary legal and physical custody of Plaintiff's minor child to "Brock Johnson pending a full and final hearing."  (Docket Entry 6-1 at 52.)  Although the State Court scheduled a hearing "to review th[at] temporary order" (id. at 53), it subsequently entered certain continuances, extending the date for said hearing (id. at 57-60).  As of Plaintiff's initiation of this action (see Docket Entry 3 (filed August 12, 2016)), the State Court had not yet held the hearing to resolve that child custody matter (see Docket Entry 6-1 at 60 (continuing matter until September 12, 2016)).

-23-

The Complaint thus falls into the third category of "exceptional circumstances" warranting _Younger_ abstention (i.e. civil proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts," _Sprint_, ___ U.S. at ___, 134 S. Ct. at 588)). _See, e.g._, _Carlson v. County of Ramsey, Minn._, Civ. Action No. 16-765, 2016 WL 3352196, at *6 (D. Minn. June 15, 2016) (determining that federal challenge to state court's child custody, contempt, and disclosure orders in ongoing child custody dispute fell within _Sprint_'s third category of exceptional cases warranting _Younger_ abstention). For example, declaring the parameters of Plaintiff's parental rights, including the standards for determining those rights, and/or declaring unconstitutional the State Court's failure to require stenographic recordings at certain "ex-parte deprivations" (Docket Entry 3 at 6), would necessarily require the Court's interference with the adjudication of Plaintiff's child custody case. To put it another way, the Complaint effectively seeks a declaration from this Court that the State Court wrongly deprived Plaintiff of her parental rights, as well as the reinstatement of those rights. Additionally, preventing the Judge Defendants from enforcing their orders (as Plaintiff seeks in her requests for injunctive relief (_see_ _id._)) would directly interfere with the Judge Defendants' performance of their judicial function of overseeing and adjudicating Plaintiff's child custody dispute, _see_ _Carlson_, 2016 WL 3352196, at *6

-24-

(recognizing that custody, contempt, and disclosure orders "are integral to the [s]tate court's ability to perform its judicial function in custody proceedings" (ellipsis and internal quotation marks omitted)).

The Middlesex factors (i.e. the importance of the issues to the State and the ability to raise federal questions in the State forum) further favor abstention under Younger. First, Plaintiff's claims implicate important state interests as they concern an ongoing child custody matter. See Moore v. Sims, 442 U.S. 415, 435 (1979) (noting that "[f]amily relations are a traditional area of state concern"); see also C.C.S. v. Child Protective Servs. of Orange Cty., No. 1:11CV81, 2011 WL 1325125, at *1-2 (M.D.N.C. Apr. 7, 2011) (recommending against exercising jurisdiction over the plaintiff's claims because of, inter alia, Younger abstention principles, and noting that child custody and visitation matters "implicate important state interests"), recommendation adopted, slip op. (M.D.N.C. June 6, 2011). Second, the State Court provides a sufficient forum for Plaintiff to assert her federal rights. See C.C.S., 2011 WL 1325125, at *2 (recognizing that state child custody proceeding afforded the plaintiff an adequate opportunity to present her federal questions).

Given these considerations, the Court should abstain from adjudicating Plaintiff's claims for declaratory and injunctive relief involving her ongoing child custody dispute in the State

Court.  See, e.g., Wattie-Bey v. Attorney Gen.'s Office, 424 F. App'x 95, 96 (3d Cir. 2011) (concluding that "*Younger* abstention principles dictated dismissal of the complaint . . . with regard to the [plaintiffs'] claims for prospective injunctive and declaratory relief based on alleged violations of their constitutional rights in the ongoing state court custody proceedings"); C.C.S., 2011 WL 1325125, at *2 (abstaining under Younger from exercising jurisdiction over action that concerned ongoing state court child custody and visitation matters).

## IV. Domestic Relations Exception

The domestic relations exception to federal jurisdiction also should cause the Court to decline to consider Plaintiff's child custody dispute claims.  That exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees." Ankenbrandt v. Richards, 504 U.S. 689, 703 (1992).  The Ankenbrandt Court's discussion of the domestic relations exception focused on the text of the federal diversity jurisdiction statute as originally enacted.  See id. at 697-702.  However, a review of the historical and statutory analysis in Ankenbrandt confirms that the domestic relations exception should apply equally to federal question cases.

The Supreme Court first described the domestic relations exception more than 150 years ago, stating that federal courts lack

-26-

"any jurisdiction . . . upon the subject of divorce, or for the allowance of alimony . . . ." Barber v. Barber, 62 U.S. 582, 584 (1858); see also Marshall v. Marshall, 547 U.S. 293, 306 (2006) (recognizing that Barber's announcement of the domestic relations exception qualified as "dicta"). Over a century later, in Ankenbrandt, the Supreme Court discussed the reasons Barber recognized the domestic relations exception. Id. at 693-699. Finding no Article III impediment to federal jurisdiction in domestic relations cases, id. at 697, the Supreme Court determined that the Barber Court had grounded the domestic relations exception in the text of the federal diversity jurisdiction statute as originally enacted, id. at 697-700.

The original federal diversity jurisdiction statute (the Judiciary Act of 1789) provided that:

> the circuit courts shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature at common law or in equity*, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs, or petitioners; or an alien is a party, or the suit is *between a citizen of the State where the suit is brought, and a citizen of another State*.

Act of Sept. 24, 1789, § 11, 1 Stat. 73, 78 (emphasis added). In Ankenbrandt, the Supreme Court noted that, although the Barber majority's invocation of a domestic relations exception did not reference this diversity statute, the dissenters made that

-27-

connection.  Id. at 698-99.  As Ankenbrandt explained, the Barber
dissenters observed that England's "court[s] of chancery lacked
authority to issue divorce and alimony decrees." Id. at 699.  The
Barber dissenters reasoned that federal courts similarly lack
authority to issue such decrees because "'the jurisdiction of the
courts of the United States in chancery is bounded by that of the
chancery in England.'"  Id. (quoting Barber, 62 U.S. at 605
(Daniel, J., dissenting)).  Such relief, in the Barber dissenters'
view, would not fall within the diversity statute's original grant
of jurisdiction over "'all suits of a civil nature at common law or
in equity.'"  Id.  Thus, in Ankenbrandt, the Supreme Court
concluded that "it may be inferred fairly that the jurisdictional
limitation recognized by the [Barber] Court rested on th[e]
statutory basis" indicated by the dissenters in that case.  Id.

     In Ankenbrandt, the Supreme Court further stressed that "[t]he
defining phrase, 'all suits of a civil nature at common law or in
equity,' remained a key element of statutory provisions demarcating
the terms of diversity jurisdiction until 1948, when Congress
amended the diversity jurisdiction provision to eliminate this
phrase and replace in its stead the term 'all civil actions.'"  Id.
at 698 (quoting 1948 Judicial Code and Judiciary Act, 62 Stat. 930,
28 U.S.C. § 1332).  With no indication to the contrary, the Supreme
Court presumed that Congress meant to leave undisturbed "the
Court's nearly century-long interpretation of the prior statutes,

-28-

which had construed the statutory diversity jurisdiction to contain an exception for certain domestic relations matters." Id. at 700.

That same historical analysis supports the conclusion that the domestic relations exception also applies to the federal question jurisdictional statute. Specifically, in 1875, Congress amended the diversity jurisdiction statute to add federal question jurisdiction, providing that:

> the circuit courts of the United States shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature at common law or in equity*, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and *arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority*, or in which the United States are plaintiffs or petitioners, or in which there shall be a controversy between citizens of different States or a controversy between citizens of the same State claiming lands under grants of different States, or a controversy between citizens of a State and foreign states, citizens, or subjects . . . .

Judiciary Act of Mar. 3, 1875, § 1, 18 Stat. 470, 470 (emphasis added). The text, "all suits of a civil nature at common law or in equity," id., precedes the grant of federal jurisdiction over suits "arising under the Constitution or laws of the United States," id., and thus delimits Congress' grant of federal question jurisdiction. At the time of that 1875 amendment, the domestic-relations exception had become well-established in the case law. See Barber, 62 U.S. 582. Based on the Supreme Court's reasoning in Ankenbrandt, by leaving in place the language "all suits of a civil

-29-

nature at common law or in equity," Judiciary Act of Mar. 3, 1875, § 1, 18 Stat. 470, Congress must have intended for the domestic relations exception to limit federal question jurisdiction, as well as diversity jurisdiction.

The notion that the domestic relations exception extends beyond diversity cases finds further support in the fact that the Supreme Court has applied the exception in other contexts. For example, in Ex parte Burrus, 136 U.S. 586 (1890), a habeas corpus case involving the custody of a child, the Supreme Court explained:

> The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States. As to the right to the control and possession of [a] child, . . . it is one in regard to which neither the congress of the United States, nor any authority of the United States, has any special jurisdiction. Whether [one person or another] is entitled to the possession does not depend upon any act of congress, or any treaty of the United States or its constitution.

Id. at 593-94. Again, based on the logic of Ankenbrandt, when Congress amended the federal jurisdiction statute to replace "all suits of a civil nature at common law or in equity" with "all civil actions," 28 U.S.C. § 1331, it presumably knew that the exception applied outside the diversity jurisdiction context, see Burrus, 136 U.S. at 593-94.

Simply put, there appears "no good reason to strain to give a different meaning to the identical language in the diversity and federal-question statutes." Jones v. Brennan, 465 F.3d 304, 307

(7th Cir. 2006). Reinforcing this view, the Seventh Circuit has acknowledged that child custody proceedings (one type of domestic relations matter) "are *in rem* in character — they are fights over a thing of value that is in the court's control — and another court should not try to elbow its way into the fight." Id. Further, as a district court in this Circuit has explained:

> Issuance of [divorce, alimony, or child custody] decrees . . . frequently involve retention of jurisdiction by the state court and deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of conflicts over child custody and support decrees. Moreover, as a matter of judicial expertise, it makes far more sense to retain the rule that federal courts lack power over these cases because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees.

Samuels v. Gelfman, Civ. Action No. 16-722, 2016 WL 1071003, at *2 (D. Md. Mar. 16, 2016); see also Jones, 465 F.3d at 307 (declaring that "state courts are assumed to have developed a proficiency in [child custody] matters, to have procedures tailored to them, and to work closely with and even employ specialized staff not found in federal courts" (citing Ankenbrandt, 504 U.S. at 703-04)). Additionally, because "state courts are authorized to decide issues of federal law unless Congress decrees otherwise, confining a class of federal-law cases to state courts does not deprive litigants of their federal rights." Jones, 465 F.3d at 307.

Despite these sound reasons for deeming the domestic relations exception applicable to federal question cases, the circuit courts remain divided on the issue. Since Ankenbrandt, the Fifth and Ninth Circuits have both stated that the domestic relations exception only applies to diversity cases. Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 947 (9th Cir. 2008); United States v. Bailey, 115 F.3d 1222, 1231 (5th Cir. 1997).[7] Before

_____

[7] The Fifth Circuit's decision in Bailey involved a constitutional challenge to the Child Support Recovery Act ("CSRA"), 18 U.S.C. § 228, a federal criminal statute. Bailey, 115 F.3d at 1224. The defendant in that case argued that "the CSRA transgresses state sovereignty by running afoul of the domestic relations exception to diversity jurisdiction." Id. at 1231. The Bailey Court disagreed, stating that "[t]he domestic relations exception obtains from the diversity jurisdiction statute, 28 U.S.C. § 1332, . . . and therefore it has no application where, as here, there exists an independent basis for federal jurisdiction. The instant action is based not on diversity but on an express grant of jurisdictional authority under 28 U.S.C. § 1331. Because this case clearly arises under this [c]ourt's federal question jurisdiction, the domestic relations exception presents no bar." Id. In fact, because Bailey involved a federal criminal prosecution, federal jurisdiction actually rested there on 18 U.S.C. § 3231, not on Section 1331, which concerns only civil actions. See United States v. Schooler, Nos. 3:10-cr-134, 3:12-cv-201, 2012 WL 2814322, at *1 (S.D. Ohio July 10, 2012) ("This [c]ourt is indeed a limited jurisdiction court, but its exclusive power to try federal crimes is conferred by 18 U.S.C. § 3231. [The d]efendant's references to 28 U.S.C. §[§] 1331 and 1332 are not relevant; those sections govern only jurisdiction in civil cases."), recommendation adopted, slip op. (S.D. Ohio Oct. 9, 2012). In any event, the Bailey Court ultimately concluded that the domestic relations exception did not apply in that case, because "[t]he CSRA in no way endeavors to regulate th[e state courts'] hallowed ground" over "the issuance of divorce, alimony, and child custody decrees." Bailey, 115 F.3d at 1231. The Bailey Court further determined that the CSRA addressed matters within Congress' constitutional power to regulate commerce. Id. at 1227-30. In other words, the Bailey Court's pronouncement about whether

Ankenbrandt, the Third Circuit held likewise, <u>Flood v. Braaten</u>, 727 F.2d 303, 308 (3d Cir. 1984), and has stood by that holding in an unpublished, post-<u>Ankebrandt</u> decision, <u>Wattie-Bey</u>, 424 F. App'x at 96 n.1.

In contrast, the Seventh Circuit has enforced the domestic relations exception in the federal question context after <u>Ankenbrandt</u>. <u>Allen v. Allen</u>, 48 F.3d 259, 261-62 (7th Cir. 1995) (finding no federal jurisdiction in action brought by husband against wife's ex-husband and state-court judge alleging that granting ex-husband visitation rights violated husband's federal constitutional rights). Similarly, the Sixth Circuit, in a pre-<u>Ankenbrandt</u> case, applied the domestic relations exception to bar federal question jurisdiction. <u>Firestone v. Cleveland Trust Co.</u>, 654 F.2d 1212, 1215 (6th Cir. 1981) (noting that, "[e]ven when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court" (citing <u>Denman v. Leedy</u>, 479 F.2d 1097, 1098 (6th Cir. 1973) (holding that "it is readily apparent that the substance of th[e] [civil rights] claim is an intrafamily custody

---

the domestic relations exception applies in the federal question context constitutes mere dicta. Thus, it appears that the Ninth Circuit stands alone in <u>holding</u> (in a post-<u>Ankenbrandt</u>, published opinion) that the domestic relations exception only limits diversity jurisdiction.

-33-

battle," and that "[a]s such this court has no jurisdiction to entertain the present suit"))).

Whether the domestic relations exception limits federal question jurisdiction remains an unsettled issue in this Circuit. The Fourth Circuit first addressed that question in <u>United States v. Johnson</u>, 114 F.3d 476 (4th Cir. 1997), when a criminal defendant challenged his conviction for willfully failing to pay child support in violation of the Child Support Recovery Act ("CSRA"), 18 U.S.C. § 228. <u>Id.</u> at 478. The <u>Johnson</u> defendant suggested that the CSRA qualified as an "impermissible invasion of state sovereignty in the area of domestic relations," violating "the domestic-relations exception to federal jurisdiction and the policies of federalism and comity that underlie it." <u>Id.</u> at 481 (internal quotation marks omitted). The Fourth Circuit began its analysis by stating that the domestic relations exception "applie[s] only as a judicially implied limitation on the diversity jurisdiction; it has no generally recognized application as a limitation on federal question jurisdiction." <u>Id.</u> The <u>Johnson</u> Court then went on to hold that the "CSRA does not attempt to regulate domestic relations," and "does not purport to modify, or to allow federal judicial modification of, any state domestic relations law or judicial decree; nor to require state enforcement of its own domestic relations laws and decrees." <u>Id.</u> In deciding the case in that fashion, the Fourth Circuit reduced to dicta its

-34-

statement that the domestic relations exception only applies in the diversity context.  See generally Tome, 153 F. at 87 (explaining that "expressions of opinion not necessary to the determination of the case are to be regarded as dicta").

Thereafter, in Cantor v. Cohen, 442 F.3d 196 (4th Cir. 2006), the Fourth Circuit construed a federal statute, the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 ("ICARA"), to effectively incorporate the domestic relations exception. Cantor, 442 F.3d at 202-05.[8]  In Cantor, the plaintiff (residing in Israel) challenged the district court's dismissal of her "access claims" brought under ICARA, seeking visitation of her minor children that resided with her ex-husband in the United States. Id. at 198.  The Fourth Circuit explained that, "[w]ith the exception of the limited matters of international child abduction or wrongful removal claims, which is expressly addressed by the Convention and ICARA, other child custody matters, including access claims, would be better handled by the state courts which have the experience to deal with this specific area of the law." Id. at 202.  In reaching that conclusion, the Cantor Court reviewed ICARA's legislative history, and found that Congress did not intend to have federal courts embroiled in deciding child custody matters.

_____

[8] ICARA implemented the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, 19 I.L.M. 1501 (1980).  Cantor, 442 F.3d at 199.

See id.  Moreover, in refusing to interpret ICARA as conferring jurisdiction upon federal courts to decide access claims, the Cantor Court expressly declined "to move domestic relations litigation to federal courts."  Id. at 204-05.

More recently, in an unpublished (and thus non-precedential, see Hogan v. Carter, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc)) decision, the Fourth Circuit reversed a district court for applying the domestic relations exception to bar an action brought under Section 1983 that alleged "state actors had deprived [the plaintiffs] of their children without due process." Reale v. Wake Cty. Human Servs., 480 F. App'x 195, 197 (2012).  The complaint in that case (similar to this one) specifically sought "an order requiring the immediate return of the [p]laintiffs' seven minor children to the full legal and physical custody of the [p]laintiff parents."  Reale v. Wake Cty. Human Servs., 5:11-CV-682, Docket Entry 1-1 at 53 (E.D.N.C. Nov. 28, 2011).  The Fourth Circuit did not discuss whether federal courts can modify child custody decrees in civil rights actions, but observed that the plaintiff "specifically invoked § 1983 as a basis for jurisdiction." Reale, 480 F. App'x at 197.  Quoting Johnson, the Fourth Circuit reiterated that "the domestic relations exception 'is applied only as a judicially implied limitation on the diversity jurisdiction; it has no generally recognized application as a limitation on federal question jurisdiction.'"  Id. (quoting Johnson, 114 F.3d at

-36-

481).  Ultimately, the Fourth Circuit held that, "[b]ecause the [plaintiffs'] complaint [was] based on federal question jurisdiction, not diversity of citizenship, the domestic relations exception d[id] not limit the district court's jurisdiction over it."  Id.

Consistent with the view that no controlling authority exists in the Fourth Circuit as to whether federal courts can issue or modify child custody decrees in cases invoking federal question jurisdiction, several district courts in this Circuit have declined jurisdiction over domestic relations matters where a litigant alleges violations of his or her federal constitutional rights (even after Johnson).  See, e.g., Samuels, 2016 WL 1071003, at *1 ("[The p]laintiff claims subject matter jurisdiction based on federal question jurisdiction. . . .  The case may not proceed in this court for a number of reasons.  First, it involves matters of family law.  Such issues have traditionally been reserved to the state or municipal court systems with their expertise and professional support staff.  Under the domestic relations exception to federal jurisdiction, federal courts generally abstain from review of such cases." (internal citation omitted)); Salvetti v. Georgia Bar Ass'n, No. 1:05CV505, 2007 WL 433390, at *1 (M.D.N.C. 2007) (noting that the complaint alleges violations of federal law, but concluding that the domestic relations exception deprives a federal court of jurisdiction to award the plaintiff custody of her

-37-

minor child); <u>Freeze v. Veterans Admin. for N.C.</u>, No. 1:00CV963, 2001 WL 34013619, at *4 (M.D.N.C. Mar. 30, 2001) (finding no federal jurisdiction over the plaintiff's challenges to certain state court orders regarding guardianship of his father, even where the complaint alleged civil rights violations); <u>but see</u> <u>Parks v. Commonwealth of Va. Dep't of Soc. Servs. Child Support Enf't Servs.</u>, 1:16-CV-568, 2016 WL 4384343, at *2 (E.D. Va. Aug. 17, 2016) (collecting cases and noting that the domestic relations exception does not apply to federal question jurisdiction arising under Section 1983).

On balance, applying the Supreme Court's explication of the historical lineage of the domestic relations exception to the statutory evolution of federal question jurisdiction, the Court should construe the exception as barring federal jurisdiction over Plaintiff's claims seeking modification of the child custody decrees previously entered in the State Court.

## V. Jurisdiction over State Claims

Lastly, to the extent the above-mentioned immunity, abstention, and jurisdictional doctrines do not preclude litigation in this Court of Plaintiff's state claims (<u>see, e.g.</u>, Docket Entry 3 at 8-9, 13-14), those claims still should not proceed in this Court.

Federal courts "have original jurisdiction of all civil actions arising under the Constitution[ and] laws . . . of the

United States." 28 U.S.C. § 1331.[9] Federal courts also maintain "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). Under Section 1332(a), original "jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373 (1978) (emphasis in original). "[I]n any civil action of which the [federal] courts have original jurisdiction, the [federal] courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a federal court "may decline to exercise supplemental jurisdiction over a claim" if it dismisses "all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

---

[9] The Complaint's jurisdictional statement alleges that "[t]his Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4)." (Docket Entry 3 at 6.) However, Section 1343's provision of federal jurisdiction over civil rights claims against state actors "has had no legal effect since 1976, when Congress amended § 1331 to eliminate any amount-in-controversy requirement." Myles v. United States, 416 F.3d 551, 554 (7th Cir. 2005) (citing Chapman v. Houston Welfare Rights Org., 441 U.S. 600 (1979)).

Here, as discussed above, Plaintiff's federal claims (i.e. those claims arising under the Constitution and laws of the United States) cannot proceed in this Court due to immunity, abstention, and jurisdictional doctrines. Nor does diversity jurisdiction exist, as the Complaint asserts that Plaintiff resides in North Carolina (Docket Entry 3 at 47) and she directed the issuance of summonses to Defendants at North Carolina addresses (see Docket Entry 7 at 1, 3, 5, 7, 9). Furthermore, the Complaint asserts that the Judge Defendants serve as North Carolina district court judges (Docket Entry 3 at 7-8), and the North Carolina Constitution requires that State district court judges "reside in the district for which [they are] elected," N.C. Const. Art. IV, Sect. 10. In light of these circumstances, the Court lacks original jurisdiction over this action under Section 1332(a). See Owen Equip. & Erection Co., 437 U.S. at 373. Given the frivolous nature of Plaintiff's effort to litigate her federal claims in this Court and the lack of diversity jurisdiction, the Court may appropriately decline to exercise supplemental jurisdiction over Plaintiff's state claims. See Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (explaining that, pursuant to 28 U.S.C. § 1367(c)(3), a federal court has "discretion to dismiss or keep a case when it 'has dismissed all claims over which it has original jurisdiction,'" and that "[t]here are *no* situations wherein a federal court *must* retain

-40-

jurisdiction over a state law claim, which would not by itself support jurisdiction" (emphasis in original)).

**CONCLUSION**

Immunity, abstention, and jurisdictional doctrines render Plaintiff's federal claims frivolous (at least in this forum), diversity of citizenship does not exist, and the Court should decline supplemental jurisdiction over Plaintiff's state claims.

**IT IS THEREFORE RECOMMENDED** that this Court dismiss the Complaint (Docket Entry 3) without prejudice to Plaintiff's right to litigate her claims in an appropriate forum.

**IT IS FURTHER RECOMMENDED** that this Court deny the PI Motion (Docket Entry 4) as moot.

/s/ L. Patrick Auld<br>**L. Patrick Auld**<br>**United States Magistrate Judge**

November 21, 2016

-41-